***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms with modifications the Decision and Order of Deputy Commissioner Taylor.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission; the Commission has jurisdiction of the parties and the subject matter. *Page 2 
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. The date of loss alleged by plaintiffs, which is the death of their eight-year-old registered Knabstrupper mare, "Menetti," is May 25, 2004.
4. On the date of loss alleged by plaintiffs, the plaintiffs were joint co-owners of Menetti.
5. From May 3, 2004 through the evening of May 25, 2004, inclusive, Menetti was boarded at the Equine Educational Unit (the "EEU").
6. Menetti was in the exclusive care, custody and control of the employees and agents of the EEU from the time she arrived at the EEU on May 3, 2004 until the time she was picked up from the EEU for transport to plaintiffs' home on the evening of May 25, 2004.
7. The EEU is, and was on the date of the loss alleged by plaintiffs, a facility operated and managed by the Animal Science Department of North Carolina State University. North Carolina State University is a constituent institution of the University of North Carolina system pursuant to Chapter 116 of the North Carolina General Statutes.
8. During May 3, 2004 through and including May 25, 2004, Justine Smith was employed as a veterinary technician at the EEU and was a supervisor of the EEU.
9. All the trial deposition exhibits are authentic and are in evidence.
10. The Local Climatological Data for Raleigh/Durham, North Carolina for May, June, July, August, and September 2004, 2003, 2002 are true and accurate copies of meteorological records on file in the National Climatic Data Center, Asheville, North Carolina, and the same are certified as such by the Records Custodian Data Administrator and the Director, respectively, of *Page 3 
the National Climatic Data Center, for the United States Department of Commerce, and said meteorological records are genuine, authentic and are in evidence.
11. The following were stipulated into evidence:
 • Stipulated Exhibit 1: Plaintiff's Trial Exhibits
 A. Affidavit of Claimants;
 B. Answer and Defenses;
 C. Necropsy Report for "Menetti"
 D. Certified Climatological Data for Raleigh/Durham, NC for May 2004;
 E. Internal Case Review: Final Approved Report;
 F. Equine Appraisal Report for "Menetti" prepared by Rebecca S. Pennington; and
 G. Curriculum Vitae for Rebecca S. Pennington.
 • Stipulated Exhibit 2: Defendant's Trial Exhibits
 A. Dr. Don Meuten's Necropsy Report of Menetti;
 B. Internal Case Review: Final Approved Report;
 C. Statement of Justine Smith;
 D. Statement of Brandon Velie;
 E. Statement of Melody Davis;
 F. Statement of Jason Reitmeyer; and
 G. History about The Knabstrup Horse.
 • Stipulated Exhibit 3: Deposition of Dr. Pinto
 • Stipulated Exhibit 4: Deposition of Dr. Sheats *Page 4 
 • Stipulated Exhibit 5: Deposition of Dr. Gradil
 • Stipulated Exhibit 6: Deposition of Dr. Haskell
 • Stipulated Exhibit 7: Deposition of Dr. Rebecca Pennington (7a video)
 • Stipulated Exhibit 8: Deposition of Dr. Meuten (8a video)
 • Stipulated Exhibit 9: Deposition of Dr. Dr. Woolard (9a video)
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiffs' mare, "Menetti" was housed exclusively at the EEU from May 3, 2004 through and including the evening of May 25, 2004, a period of twenty-two days, for the purpose of breeding management, which included evaluation of Menetti's estrus cycle, preparation for breeding, and artificial insemination.
2. The EEU is a facility in Raleigh, North Carolina operated by the North Carolina State University Animal Science Department that temporarily houses mares brought in by clients, such as the plaintiffs, for breeding management.
3. During the entire twenty-two days Menetti was housed at the EEU, the EEU staff was exclusively responsible for providing Menetti with the essentials of life, including shelter, food and an adequate supply of water.
4. During the entire twenty-two days Menetti was housed at the EEU, the EEU staff was comprised solely of undergraduate students supervised by a few non-student state employees, none of whom was a veterinarian or veterinary school student. The undergraduate student *Page 5 
employees of the EEU worked for an hourly wage of $5.50. These undergraduates usually have an interest in gaining admission into veterinary school, which is a highly competitive process.
5. During the entire twenty-two days Menetti was housed at the EEU, Justine Smith was employed as one of two managers at the EEU who supervised the undergraduate student employees of the EEU.
6. Justine Smith, by written admission, "was the person responsible for Manetti's [sic] care" while Menetti was housed at the EEU.
7. The plaintiffs' "Affidavit of Claimants" gave sufficient notice to the defendant to allow it to narrow its investigation to Justine Smith and the EEU personnel under her supervision who were involved in the care of Menetti, and the defendant did in fact conduct an investigation of Justine Smith and the EEU personnel under her supervision who were involved in the care of Menetti.
8. The EEU contains a barn with covered stalls as well as a large pasture. Mares housed at the EEU are sometimes kept in a stall and sometimes kept in a pasture.
9. The plaintiffs caused Menetti to be transported from their residence in Benson, North Carolina to the EEU on May 3, 2004. Menetti was transported by Tammi Kelly via Ms. Kelly's horse trailer. Plaintiff Dawn Phillips ("Mrs. Phillips") accompanied Ms. Kelly and Menetti. Upon their arrival at the EEU they were met by Justine Smith.
10. When the plaintiffs placed Menetti in the exclusive care, custody and control of Justine Smith and the other agents and employees of the EEU, Menetti was a young mare in an excellent state of overall general health.
11. During the first week Menetti was housed at the EEU, Mrs. Phillips visited Menetti twice. On one occasion, Mrs. Phillips observed Menetti outside during the daytime and *Page 6 
observed that Menetti's water bucket contained only "sludge" and not water. Mrs. Phillips attempted to inform Justine Smith of Menetti's lack of water, but Justine Smith was not then on the premises. Mrs. Phillips rinsed out Menetti's water bucket and filled it with water, and then informed EEU staff members that Menetti had been outside with no water. EEU staff assured Mrs. Phillips that the situation would be addressed, and Mrs. Phillips took them at their word.
12. Each of Mrs. Phillips' visits with Menetti occurred during the first week to ten days Menetti was housed at the EEU.
13. Plaintiff Jeffrey Phillips ("Dr. Phillips") never visited Menetti during the time Menetti was housed at the EEU.
14. After Menetti was inseminated at the EEU, the plaintiffs arranged for Tammi Kelly to pick Menetti up from the EEU on the evening of May 25, 2004 and transport Menetti directly to the plaintiffs' residence via Ms. Kelly's horse trailer.
15. Tammi Kelly arrived at the EEU at approximately 8:30 p.m. on the evening of May 25, 2004 and loaded Menetti onto her open stock horse trailer. When Ms. Kelly arrived at the EEU to pick up Menetti, she immediately noticed that Menetti's breathing was "labored" and that Menetti's sides were moving heavily as she breathed. Ms. Kelly could not find any EEU staff from whom to inquire about Menetti's condition. Ms. Kelly suspected something might be wrong with Menetti and considered taking Menetti straight from the EEU to the veterinary hospital, but she decided to take Menetti to the plaintiffs' residence instead because she knew plaintiff, Dr. Phillips, was a veterinarian.
16. The trip from the EEU to the plaintiffs' residence passed without incident. Tammi Kelly arrived at the plaintiffs' residence with Menetti shortly before 9:30 p.m. on the evening of *Page 7 
May 25, 2004. Immediately thereafter, the trailer door was opened and Menetti was discovered lying on her side inside the trailer, dead, with no apparent signs of any injury.
17. Upon discovering that Menetti was dead, Mrs. Phillips telephoned Justine Smith, and a very brief conversation ensued.
18. Thereafter, Justine Smith telephoned Dr. Carlos Pinto, a doctor of veterinary medicine and an assistant professor at the North Carolina State University College of Veterinary Medicine ("NCSU CVM"), at approximately 9:30 p.m. and told him that Menetti had died while being transported. Justine Smith was very upset during this telephone conversation.
19. Tammi Kelly and Dr. Phillips transported Menetti's body directly from the plaintiffs' residence to the NCSU Veterinary Teaching Hospital ("VTH") in Raleigh so that Dr. Pinto could attempt to harvest a viable embryo from Menetti, and so that a necropsy could be performed.
20. Upon their arrival at the VTH, Dr. Pinto began his harvesting procedure in the VTH's enclosed large animal breezeway, working on Menetti where she lay in Tammi Kelly's horse trailer. The harvesting procedure took between fifteen and twenty minutes.
21. Upon completion of Dr. Pinto's procedure, between 10:00 and 11:00 p.m. Menetti's body was transported to the VTH's cooler and placed inside. The cooler is a large refrigerated section of the VTH where animals are stored pending necropsy, in order to preserve the tissue. VTH policy is that animals delivered for necropsy are placed in the cooler promptly upon arrival.
22. The next morning, a necropsy to determine the cause of Menetti's death was performed by Dr. Donald J. Meuten and Dr. Kevin Woolard. Dr. Meuten is a doctor of veterinary medicine and a professor of pathology and clinical pathology at the NCSU CVM, *Page 8 
board certified in anatomic pathology and clinical pathology, and he was the senior pathologist for the necropsy. Dr. Woolard is a doctor of veterinary medicine who was then completing his residency in anatomic pathology at the NCSU CVM, and he was the anatomic pathology resident for the necropsy. Dr. Meuten and Dr. Woolard each testified as experts in veterinary pathology without objection from defendant.
23. Dr. Woolard retrieved Menetti from the cooler between 7:30 and 7:45 a.m. on the morning of the necropsy. Both doors of the cooler were closed and sealed, the cooler appeared to be functioning properly, and the temperature was cold enough to preserve the tissue.
24. Dr. Woolard delivered Menetti to the necropsy suite and the necropsy began within ten minutes of removing Menetti from the cooler. The necropsy was performed within twelve hours of Menetti's death.
25. Dr. Meuten and Dr. Woolard made the following clinical findings during Menetti's necropsy: there was a marked degree of autolysis (tissue degradation) throughout the carcass; there was a large amount of fluid in the lungs, and the blood vessels in the lungs were expanded and congested; there was fluid in the upper gastrointestinal tract; there were large amounts of calcium oxalate crystals in the kidneys; there was an absence of any gross lesions that could have been responsible for Menetti's death; and there was an absence of any sign of infection, fever, or disease process.
26. Based upon their findings, Dr. Meuten and Dr. Woolard were each of the opinion that the cause of Menetti's death was more likely than not heat stress.
27. When all of the clinical findings noted during Menetti's necropsy are found together in the same animal, it is strongly indicative that, more likely than not, the cause of the animal's death was heat stress. *Page 9 
28. The conditions under which Menetti's body was refrigerated, including the time at which Menetti was placed into the cooler after her death and removed from the cooler prior to the necropsy, were not a factor in any of the necropsy findings.
29. Menetti's body temperature was likely elevated for some period of time before she died.
30. Menetti was not suffering from an infection or a disease that would have caused a fever when she died.
31. The amount of calcium oxalate crystals found in Menetti's kidneys was much higher than normal and is strongly indicative of at least moderate dehydration.
32. Water ingestion is a major cooling mechanism for a horse and lack of adequate water could contribute to a horse developing heat stress.
33. On June 21, 2004, a written report of the necropsy findings was issued that confirmed the conclusion of Dr. Meuten and Dr. Woolard, that Menetti most likely died from heat stress due to dehydration. Dr. Woolard prepared the necropsy report in collaboration with Dr. Meuten. Dr. Meuten was further of the opinion that while witnesses might "fib," Menetti's body did not lie. Based upon Menetti's body, it was Dr. Meuten's opinion Menetti died of heat stress.
34. The reference to environmental conditions in the necropsy report was based on Dr. Woolard's recollection of the time around Menetti's death as being "quite warm."
35. On May 25, 2004, the day that Menetti died, the high temperature recorded by the National Climatic Data Center for Raleigh/Durham was ninety-three degrees Farenheit, with a relative humidity as high as ninety percent (90%), no precipitation, and mostly clear skies. For the four days immediately preceding Menetti's death, the high temperature each day was likewise in the nineties. *Page 10 
36. A horse of Menetti's size needs to consume between twenty and thirty gallons of water per day under normal conditions. A horse of Menetti's size needs more than thirty gallons of water on a day with a high temperature in the nineties. If a horse like Menetti is deprived of only five gallons of water each day for five days, it could still die of heat stress at the end of five days with ample water in its bucket at the time of death.
37. After the necropsy, but before Dr. Meuten and Dr. Woolard had finalized the necropsy report, Dr. Woolard approached plaintiff Dr. Phillips and asked Dr. Phillips when Menetti had died and how Menetti had been transported from the EEU to the Phillips' property. The reference to "the data Dr. Phillips reported regarding historical information" in the necropsy report referred only to Dr. Phillips' responses to Dr. Woolard's two questions: i.e., that Menetti had died the evening before the necropsy, and that Menetti had been transported via a hauler from the EEU to the Phillips' property, where Menetti was found to be dead on arrival.
38. On the day Menetti died, four undergraduate student employees of the EEU who cared for her while she was housed at the EEU noted that Menetti had been coughing repeatedly during that day at the EEU. Although the persons charged with Menetti's care, Justine Smith and the undergraduate students, have stated that Menetti was in the barn all day on the date of her death, Dr. Carlos Pinto indicated that when Justine Smith called him to come to the hospital to receive Menetti's body, she said "around 1:00 p.m., when the mare was brought to the barn, they did a TPR . . ." ". . . I just remember that when she was brought to the barn at 1:00, they saw the need to do a TPR . . ." "I think she came from the outside paddock, to the barn, around midday . . ."
39. Some time after 11:00 a.m. on May 25, 2004, the day Menetti died, one of the undergraduate student employees of the EEU called Justine Smith, who was not at the EEU that day, and informed her of Menetti's repeated coughing. Ms. Smith instructed the students to *Page 11 
perform a TPR checking Menetti's temperature, pulse and respiration. Although no record exists of this test, the students charged with conducting the test indicated that the results were normal. However, an increased rectal temperature in a horse will not be noticed until the horse has reached a more advanced heat stroke, it would not be coincident with early dehydration.
40. After being notified of Menetti's repeated coughing, Justine Smith instructed the undergraduate student employees of the EEU to move Menetti to a stall without hay or grain but with a fan.
41. Justine Smith did not instruct any of the EEU personnel to seek veterinary medical attention for Menetti or to have Menetti evaluated by a veterinarian on the day that Menetti died, and none of the EEU personnel who cared for Menetti that day did so.
42. Menetti's coughing on the day that she died could be indicative that her lungs were then filling with fluid.
43. At the time of the hearing before the Deputy Comissioner, plaintiff Dr. Jeffrey Phillips, D.V.M., Ph.D., was a doctor of veterinary medicine, board certified in internal veterinary medicine, and was an Assistant Professor of Veterinary Medicine at the University of Tennessee College of Veterinary Medicine.
44. Menetti was a registered "Knabstrupper," a rare breed of horse of which there are less than 3,000 registered in the world. Menetti's father was one of the top three Knabstrupper stallions in the world.
45. Knabstruppers are bred mostly in Europe. As recently as 1999, there were no Knabstrupper horses in the United States.
46. The plaintiffs purchased Menetti from a breeder in Denmark and imported Menetti to the Unites States in April 2002. *Page 12 
47. The Knabstrupper breed is known for its spotted hair color, and buyers who purchase Knabstruppers as competition horses prefer to buy a colored, spotted horse.
48. Menetti was especially unique and valuable among Knabstrupper horses because she was a "few spot, white born" mare, meaning that her hair was predominantly white and marked with only a very few spots. This was Menetti's most important physical characteristic because it meant that Menetti carried two copies of the spotting gene and she would therefore be certain to produce a colored, spotted foal regardless of the color of the horse she was bred to.
49. Menetti's conformation and movement were excellent and she had a good deal of dressage training, making Menetti valuable as a show horse in addition to her value as a broodmare.
50. When the plaintiffs purchased Menetti in 2002, in addition to Menetti's purchase price, the plaintiffs incurred additional, necessary expenses associated with importing Menetti, including costs for air transportation from Denmark to the United States and costs for a mandatory quarantine.
51. Rebecca Pennington, who is a Certified Equine Appraiser, President of the American Knabstrupper Association, and a person with extensive experience in both the importation of Knabstruppers from Denmark and Germany into the United States and the breeding management of Knabstruppers, testified as an expert witness in the field of breeding, raising and marketing Knabstrupper horses, and specifically as an expert in the economic value of Knabstrupper horses, without objection from defendant.
52. Menetti's economic value on the day that she died, May 25, 2004, as measured by the total cost to replace her with a comparable Knabstrupper mare, was approximately $40,000 in U. S. currency. *Page 13 
53. As of June 25, 2005, the total cost to replace Menetti with a comparable Knabstrupper mare was $41,632.65 in U.S. currency. As of that date, there were no Knabstrupper mares comparable to Menetti available for sale in the United States, and a comparable horse could only be purchased in Europe.
54. As of October 2, 2006, the date of Ms. Pennington's deposition, the total cost to replace Menetti with a comparable Knabstrupper mare was $45,639 in U.S. currency. As of that date, there were no Knabstrupper mares comparable to Menetti available for sale in the U.S., and a comparable horse could only be purchased in Europe.
55. Menetti's economic value, as measured by the total cost to replace Menetti with a comparable Knabstrupper mare, has increased during the period of time since Menetti's death as the European breeders have become aware of the increased interest in their horses and have increased their prices.
56. The exchange rate between the Euro and the U.S. dollar increased after Menetti's death on May 25, 2004, such that the cost in U.S. dollars of a good or service purchased in Euros increased after Menetti's death.
57. As of April 13, 2007, the date of the hearing before the Deputy Commissioner, there were no Knabstrupper mares comparable to Menetti available for sale in the United States, a comparable horse could only be purchased in Europe, the exchange rate between the Euro and the U.S. dollar was at approximately a 1:1.33 ratio, and the total cost to replace Menetti with a comparable Knabstrupper mare was approximately $50,000 in U.S. currency.
58. The Full Commission finds that Justine Smith and the EEU personnel under Justine Smith's supervision breached their duty of care and were negligent in the following respects: *Page 14 
 a. Allowing Menetti to become dehydrated and overheated while in their exclusive care, custody and control, such that she died of heat stress within an hour of being released from their exclusive care, custody and control, was a negligent act.
 b. Failing, in the extraordinarily hot and humid days prior to Menetti's death, to provide Menetti with a quantity of water sufficient to prevent Menetti from becoming dehydrated and overheated and sufficient to prevent Menetti from developing heat stress was a negligent act.
 c. Failing, on the day that Menetti died, to appreciate from her repeated coughing that she was in respiratory distress such that she was in need of medical attention from a doctor of veterinary medicine, and failing to obtain said veterinary medical attention for Menetti, was a negligent act.
 d. Justine Smith's failing, after being informed of Menetti's repeated coughing, to order the undergraduate employees of the EEU under her supervision to obtain medical attention for Menetti from a doctor of veterinary medicine on the day that Menetti died, was a negligent act.
59. As a direct and proximate cause of the negligence of the EEU, a facility operated and managed by the Animal Science Department of North Carolina State University, a constituent institution of the University of North Carolina system, by and through the negligence of its agent Justine Smith and the EEU personnel under her supervision, the plaintiffs were severely and permanently injured.
 *********** *Page 15 
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The EEU is, and was on the date of the loss alleged by plaintiffs, a facility operated and managed by the Animal Science Department of North Carolina State University. North Carolina State University is a constituent institution of the University of North Carolina system pursuant to Chapter 116 of the North Carolina General Statutes, and as such is subject to the jurisdiction of the North Carolina Industrial Commission, pursuant to the Tort Claims Act, N.C. Gen. Stat. § 143-291et seq.
2. "Under the Tort Claims Act, negligence is determined by the same rules as those applicable to private parties." Bolkhir v. N.C. StateUniv., 321 N.C. 706, 709, 365 S.E.2d 898, 900 (1988). To establish negligence a plaintiff must show that defendant failed to exercise due care in the performance of a legal duty owed to plaintiff and that the negligent breach of that duty was the proximate cause of plaintiff's injury. Id.
3. Justine Smith and the EEU personnel under Justine Smith's supervision breached their duty of care and were negligent. The negligence of Justine Smith, acting within the course and scope of her employment, and the other EEU personnel under Justine Smith's supervision, acting within the course and scope of their employment, was a proximate cause of Menetti's death from heat stress, and therefore a proximate cause of the plaintiffs' injuries. N.C. Gen. Stat. § 143-291et seq.
4. As a direct and proximate cause of the negligence of the EEU, by and through the negligence of its agent Justine Smith and the EEU personnel under her supervision, the plaintiffs were severely and permanently injured. Thus, plaintiffs are entitled to compensatory damages in *Page 16 
an amount sufficient to restore them to their "original condition" and give them back that which was lost. N.C. Gen. Stat. § 143-291 etseq.; see Phillips v. Chesson, 231 N.C. 566, 571, 58 S.E.2d 343, 347
(1950).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. The defendant shall pay to the plaintiffs $50,000 for compensatory damages, representing the total cost to replace Menetti with a comparable Knabstrupper mare.
2. An attorney fee in the amount of twenty-five percent (25%) of the award plus costs is hereby approved and awarded to the plaintiffs' attorneys for their services to the plaintiffs, to be paid by the plaintiffs to their attorneys from the award made above.
3. The defendant shall pay the costs as allowed by law.
This the 18th day of April, 2008.
S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 17 
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1